The next case is 523-0199. When you approach the podium, please state your name for the record. Good morning. My name is James Richard Myers. I'm a counsel for Michael and Kathleen Hammock in this case, both at the trial of and here on appeal. Sorry, I'm going to try to get you Justice's case as well. We're the appellant in the case. So I remember the day that Michael Hammock came to me and told me what his neighbor did. He had pictures of standpipes that are in the record. Installed on his property line and berms that his neighbor built around them. My first thought was, you can't do that. You can't do that. It's obvious from these pictures and Michael's explanation of what happened here and that his neighbor was restricting the natural flow of water. I don't need engineers to tell me that. You can see it. It's obvious. And because the appellant can't deny that he filled in waterways across his property that existed since 1940, he cannot deny that he established berms along the property line that he shares with the Hammocks and he cannot deny that he's tried to divert surface water into a tile system that was never meant to handle surface water. Didn't your client build a landing strip? That's correct. I'll get to that. It's about a half a mile long. It is a half a mile long along the property line. That's correct. And the only drainage under the landing strip is those two culverts? I don't know that that's exactly correct. The natural drainage, according to the engineer and the testimony, is overland flow plus through these two ditches. There were two ditches, always were two ditches, both on the Hammock property and on the old property. If you look at the pictures, the ditches on the Hammock property are better maintained. They're kind of squared up. The ditch on the Hammock property is a 15-inch or an 18-inch culvert? Correct. And that's draining an entire 80-acre property. I think that there was a bit more acres in the drainage area, if I remember the testimony, because it's more than just Mr. Hammock's property. The facts, I believe, were that the southern portion of Mr. Hammock's property flows somewhere else and the north part of Mr. Hammock's property plus some water from another area goes through those culverts. I think it was 100? I'd have to check the record. I'm sorry. But there's significant acres of water that goes through those culverts. That's correct. But the evidence was that the natural flow of water was overland and through two ditches. That was the testimony of the engineer that was hired, and it went out there and did topographical surveys and waterlogical surveys and all these fancy words that I'm not good at. He testified, Lee Beckman, that the natural flow of water in this area is overland and through those two ditches. And it is true that natural flow of water can be through ditches. It doesn't have to be just overland. Natural flow of water can be through ditches. In fact, it can be through culverts, because in the Doe v. Golden case that the Supreme Court had that cited by both me and the appellee, water passed through culverts. And the Supreme Court observed that water passing through these culverts naturally flowed across defendant's land into a drainage ditch. And that's what we have here. We have water flowing through culverts naturally flowing across defendant's lands into a drainage ditch, through drainage ditches into a creek. So the first contention of error that we have is that there was a mistake made by the trial court in that the hammocks somehow altered the natural flow of water with this RLA runway. Runway is the common term I use when my client got mad at me when I said RLA, but it's a runway. And there's no credible evidence of that. What Mr. Hammock did when he installed this runway is he put culverts in the existing ditches where the water already went and the water continues to go through there. And we know that because there's only two witnesses that can testify, and they did, as to how the water flowed after Mr. Hammock did his work. And it was Mr. Hammock himself who testified that it's the same. And the farm tenant, Mark Abert, who also said, I didn't notice any change in the drainage after Mr. Hammock performed his work. And it's hard, you can visualize it in the sense that if I just built a bridge over these ditches, a nice big bridge, no one's going to say that altered the natural flow of drainage. No one's going to say that. And the culvert in this case is just like a bridge because the water goes right through there, there's a pot cap over it, and there's no testimony from anybody that that changed the natural flow of the water. There are only testimony, and when I say testimony, I'm talking about factual testimony of people who actually observed it. So it seems that that, and it's obvious that from the facts, as stated by the people that saw it and observed it, that there was no change to the drainage. The trial court said that the changes made by Mr. Hammock prior, any change made prior to Mr. Hammock's changes were acceptable. So, you know, changes after Mr. Hammock have to be the ones that we're talking about here. And there was no change in that drainage until Mr. Ulrich, the appellate, came in and did what he did. So anyway, that is a hard rule for us to huddle, I understand, because it's a manifest way to the evidence. But all the fact testimony is that the natural flow of water was that way, and I understand over time that it's difficult, but that's exactly what the appellate court did in that Swigert v. Gillespie case. In that case, a Soviet landowner, and there's no question that Mr. Ulrich's property is Soviet and Mr. Hammock's is dominant, that Soviet landowner built a dirt perm along the property line. That sounds familiar. And the court, the appellate court, overruled the trial court's finding that that did not have to be removed. So it can be done, and it should be done in this case, because the facts, as evidence at trial, do not support a finding that the drainage was changed by Mr. Hammock's improvements. Whose witness was Mr. Beckman? He was our witness. And didn't he agree that the culverts are undersized? He did agree that the culverts are undersized, and that's a valid point. But that point actually should help appellee not hurt them, because if you look at those pictures, the water comes across Mr. Hammock's property up to the runway, and then after the runway, it flows onto Mr. Ulrich's property. If you look at the pictures, there's flooding on both sides of those. The runway is not going to cause flooding on Mr. Ulrich's property. It's going to cause flooding on Mr. Hammock's property. But only on Hammock's property that's upstream. It's not going to cause flooding downstream past the runway. Is the rate of flow that can cause erosion? Rate of flow could cause erosion, Your Honor. Of course, if the rate of flow would be slow as far as cubic feet per minute if the culverts are undersized, the velocity could increase. But again, if you look at these pictures, well, no witness testified that they ever saw this fire hose effect or anything close to it. Nobody ever said that they saw that. And then if you look at the pictures before those culverts were installed, you can see pictures where there's a ditch all the way across Mr. Ulrich's property, the whole quarter mile, and that certainly is not caused by water velocity at a point on Mr. Hammock's property, and it certainly isn't caused by culverts because the culverts weren't there. So there was significant erosion and significant deterioration of the old property prior to the culverts even being there. And so I think the engineer testified in the record that if you had this fire hose effect that no one saw, you could see effects maybe 10 feet, maybe 20 feet, maybe 30 feet, but certainly not a quarter mile down the way, which is where those effects were seen even prior to the culverts being installed. Did that answer your question? Well, you did give me an answer, yes. Yes, thank you. We also have a legal error that we're claiming that the good husbandry of the serving estate is not relevant, and the trial court did seem to examine that. The good husbandry rule in all the cases recited in this court was invoked when a dominant estate person made changes to their property, not when a serving estate made changes to their property. Again, quoting from that Swigert v. Gillespie case that's in the briefs, the dominant landowner may alter or increase natural flow of water from his property if the advantage to the dominant land sufficiently outweighed the damage to the serving land. By contrast, the serving owner may not obstruct natural flow of surface water from a dominant owner's property. So even if we consider what Mr. Orr did as good husbandry, it doesn't go into the factor of the analysis of how this should be. I'm going to point out before I sit down two things. The trial court's analysis is flawed because the land that Ulrich owns now was eroded before the culverts were ever put in there, and we know that from the historical pictures. There's two ditches running across his property that are deep. There was disputes over how deep they were, but they were deep. Could it be a sign that your clients had caused this damage for quite a while? Of course, this is from 1949, so the culverts could not have possibly done that. The culverts were installed in 84, 85, and the big ditch ravines across Mr. Orr's property were already there. They continued to be there up until Mr. Orr filled them in. So you can't – that belies the fact that somehow these culverts caused the problem, or even the RLA causes the problem. And then the trial court also said that at the end of it, it says if Mr. Hammett doesn't like – if Mr. or Mrs. Hammett don't like the situation, they can take their RLA out. Okay, they take it out. How long has it been since he used it? The evidence was disputed on that. He used to use it a lot. He uses it infrequently. It does appear on national runway maps as a potential emergency landing site. That was in the record as well. I believe his personal use was very limited of it. But again, that's – assuming he took it out, if you look at the picture, if you look at the picture, the flooding is not on the Hammett side of the runway exclusively. It's also on the Ulrich side. And that can't possibly be caused by the runway. That's caused by what Mr. Ulrich did in putting up berms and filling in where the surface water used to go and now trying to route it down into an underground tile system that's not designed for that. It's evidently clear. There's no dispute that that tile system is not designed for that. How much dirt cover is there over the top of the two culverts? I'm not sure that's specific in the record, but the picture probably shows very little. But Mr. Hanek, I believe, testified that he put the culverts in and got the culverts of the size that they would not make a bulge and that he could put a little bit of dirt over to make his runway flat. I believe that's in the testimony. So, again, the issue here is natural flow of water, which the evidence says this is natural flow of water, always was until it was blocked by the survey of the state who had no right to block it. And so we think the trial court committed those errors and we'd ask that you reverse. Thank you. Thank you, counsel. Counsel, Epelin. May it please the court. Mr. Myers. Well, I could state your name and everything. My name is Bill Leuco. I'm sorry, Your Honors, and I represent the Urick Family Farm. Say it again. I represent the Urick Family Farm, who is a defendant in the case, and is the appellee here today. I know you have from the pictures in the briefs, you know there's two 80-acre farms right next to each other adjacent. The west is Mr. Hanek, the east is Urick Family. The water naturally flows, sheet flows, west to east. Mr. Hanek simply made a significant alteration to the natural flow of the water. He did it three ways. He initially built the runway. This is a half a mile long. That's 2,640 feet. Now he put the runway there. He crowned it six inches high. This is by the USDA and the NRCS. Both of these parcels are non-highly erodible land. This is flat ground, if you're out there, Your Honors. If you stood in the middle of these 160 acres and spun 360 degrees, you are seeing flat farmland. So it's not a no-till. No. He got a special use permit, and he made the alteration by building the runway the entire half mile. I think there's maybe 200 feet off by the road that there's not a part of the runway. This runway, when he submitted to the county, he got the permit, was 70 feet wide. It was 32 feet buffer on Mr. Hanek's side, 32 foot buffer on Mr. Urick's side. What do you mean by buffer? The FAA and IDOT required that the 70 foot of runway have to have additional space to protect. If the trees can only be so tall within that feet, you can only put low crops there. You can't put high crops. It's just for extra, what I call, buffer space. That's all to be on Mr. Hanek's property. When he showed the county, and if you look at the exhibit, which is our first exhibit attached to the brief, he showed that he was going to put tile only under the 70 feet. He didn't disclose he was going to put steel culverts 100 feet. In other words, he was going to run those steel culverts under his 32 feet, right up to within feet of the property line. Make a huge alteration on how this water is coming out. He's not buffering any of this water in his 32 feet. He's putting it all 32 feet further, if you will, onto Urick. He's not taking it in the 32 feet. What do you mean by taking it? Letting the water come out on his property. Are you suggesting that had he stopped the code of 32 feet short of the property line, some of the erosion would have occurred on his property? There would have been less erosion. Some of the erosion would have occurred on his property, yes, Your Honor, and less on Mr. Urick. Less on the survey. Yes, sir. The second thing he did was, besides the berm, you've got half a mile of water that's sheet flowing at a slow rate because this is flat. And he's now, by burning it, he's actually causing it to back up and he's now putting in culverts. The second thing he does is, he puts in undersized culverts. So you're saying an oversized larger culvert would fix the problem? It's going to have to be a very large culvert, but I think it's conceivable if he puts it down deep enough that that could help the problem. But what he did was, he put an 18-inch culvert, which you can see from my face. He did a 15-inch culvert. We call it the north is 18, the south is 15. So instead of this sheet flowing, it's being forced through this by his own design. The engineers, including his engineer, said that all of this water is now being forced through these two culverts except two acres on the north side is bypassing the north culvert, and I believe one acre on the south side is bypassing the south culvert. So in essence, he's now sending 77 acres of water that used to sheet flow slowly, if you will, across a half a mile through two culverts. So there never was an original ditch? There is open swales running through these properties. What about the council's argument that the old aerial maps show these previous ditches? There's no doubt there's maps that show water is running across both properties, and it's having a depressing effect on the land, and you can see that running west all the way across. I mean, running from west-east all the way across both 80-acre farms and empties into a creek. That's true. How many ditches are involved here? You're saying there's more than one now? No, I think there was just, you could see two on old maps. They're still there today. You still see what Mr. Yerrick has done by his countermeasures of the berm. He slowed down the water. We are still today taking all of the water from Mr. Hammock's property. I would say most of it that he's altered and forcing on us unnaturally through the culverts and causing this fire hose effect. But anything else that comes over land, lands on the eastern part of the runway, if you will, we're still taking all of that. We're slowing it down, but it still goes around our berms and continues on as it has for ever after west to east to the creek. He does another thing, and I can't emphasize enough the undersizing of these culverts. Mr. Lucco, doesn't the berm reconfigure the flow of the water? The berm on the runway? The berm on your client's property that was built. No, I don't believe it does, Your Honor. It slows it down and the water still goes around the berm. This is a 30 to 50 foot of berm behind the drain where he's trying to take some underneath, which had nothing to do with this. And their expert said, Mr. Yerrick's underground system has no relevance to this. They initially said, well, you built your system too small. Well, he built a system to drain his own water for good husbandry purposes. He didn't know this was being shot across him. He didn't appreciate that. I didn't hear that last part. Go ahead. Mr. Yerrick didn't appreciate initially that he was going to be taking water shot across in these culverts. It's under tremendous pressure, Your Honor. And let me give you an example. On the north end, the natural, by all the engineers, cubic feet of water is flowing 59.2 cubic feet per second. It can only take, I think, 3.8, it can only take 3.9 to 6 cubic feet per second. So every time 59 cubic feet... So is he stockpiling the water then on one side? Yes. Okay. Yes, that is exactly what's happening. As his expert said, Judge, he's caused his own problem. 59 cubic feet come this second. He's taking 6. 59 feet come this next second. He's taking 6. 59 feet the next, 6. That differential... Under those numbers you're giving, you're talking about a 10-year reign. I'm talking about a 10-year reign, Your Honor. And both the north and south culverts, it can only take... He's only running about 10% through that, those culverts. 90% are backing up, for which he wants to blame Mr. Yerrick. We did, there was testimony, Your Honor, about a 2-year reign. That figure was, on the north end, was all the testimony was about, was 32.6 cubic feet per second. And it can still only take that 3.5 to 6 cubic feet. He was, under the best of circumstances, a 2-year reign. He's accepting 16%. 84% is backing up. So he's put up precise culverts. He's running 77... Let's talk about the berm. Does the berm block any of the culverts? Does the berm of the runway, Your Honor? Yes. Yes. The berm of the runway is... And then it has to encounter this crown going up towards 6 inches high. And it's not getting there, and it's sloping back down. And what gets blocked coming into the culvert is like backing up like in a line to get through the culverts. So it's sitting there on Mr. Hammock's property, for which he's blaming us. All the engineers testified otherwise. They said... His ex-engineers, Beckman, both engineers, said he's causing his own problem here by undersizing this. The third problem he does is the way he slopes these culverts. So the undersize concentrates the water. The berm, keeping it from sheet flowing, trying to run 77 acres through. Through the small holes, instead of sheet flowing, causes this concentration problem. And then he slopes these culverts. What's the slope on the culverts? The slope on the culverts from the natural land, the testimony of the engineers, is 2.7 times that of the natural land. So here's the natural land, and now he's sloped the culverts like this. The evidence will also show, and you can look at the exhibit that they attached to their brief, it's a cross-section that was done by their engineers that shows along this runway, every so many feet, a cross-section. If you just take a moment to look at those, you will see the two cross-sections where these culverts are, where he's run the culverts. There, the testimony was, on the northern culvert, he dug out an area where the slope was 11 times larger. The 42 feet on the north end, he digs out, so he can put the culvert in, he slopes that 11 times the natural slope of the land. If you look carefully at that part of their exhibit, you will see that it also shows the inches. He dug out about 20, 19, 20 inches down to put that culvert in. It makes sense. That culvert is 18 inches in diameter. He testified he dug nothing out. That's not how he put this in. He just laid them in the land. Well, he did lay them in the land, I submit, but only after he dug them out significantly. That one's 11 times. When you go to the south culvert, which is a 52-foot area, the testimony evidence is, and it's shown on their engineers' cross-sections, which they attached, he dug that out, Your Honor, 20 times the natural slope. It's like this. When you look at those, and I urge you to do so, it's radical. It pops out at you what's going on with these two culverts. Without you knowing, that's where the culverts are. Then he dug that one down about 17 inches. He's got a 15-inch culvert he's putting in there. He blocks this from the sheet flow by the runway. He undersizes it with these 15- and 18-inch culverts. Then he slopes the culverts, which now increases the velocity tremendously. All of this has had the effect of creating, all of three engineers said, severe erosion on Mr. York's property. Mr. Beckman said, in dealing with the backup of the water, he said, Well, that's his own issue, meaning Mr. Hammock's. We'll hire him. By undersizing these culverts, he's created his own issue. If you also think about this, he burned this runway. That's okay, but he tells us he didn't bring any dirt in. I have no reason to think he did. He tells us he pushed dirt up to make this crown 70 feet and 6 inches high. He denies that that dirt would have gone somewhere. When he burns it up, wherever he pushes that dirt from, he's lowering the dirt there. On both sides of the 70 feet, if you will, in the 32-feet buffers, he's lowered water. Whenever there's a water issue, it's going to pond there. He has created it. When it backs up because it won't go through, 90 percent doesn't go through and backs up. It has a place to lay. It's right there where he's probably pushed the dirt from it. He pushed this dirt a half a mile of dirt from both sides to create this burn. He's also created a little spot on Mr. York's side. So he dug on his side? No, he dug right up to his property line. The 32-feet buffer is what he's partially used to burn up the 70-foot runway. He says that's what he did, but he denies that it's created a low spot there. So when the water slows down and it hits Mr. York's two berms, mind you, we're talking 50 to 100 feet, let's say, instead of 2,600 feet, it hits there and to the extent it is slowing it down and going around, it can back up into the low area he has created. So it doesn't back up on the other property? No. It was testified to by Mr. Beckman, one of his experts, that the water backs up on Hammock way before it ever can get to York's berms. So the big problem Mr. Hammock doesn't like is created by himself. Now, I couldn't hear exactly what he said, but it's important to know that we didn't file the suit. We're taking his water. It was going there before. That's right, and we're still taking it. We're still taking it. We're slowing it down, but we're having to deal with the unnatural. We're no longer taking natural flow of water. We're taking 77 of the 80 acres that are now flowing unnaturally. So he couldn't put a large house there. Is that what you're saying? No, he's farming his ground. No, I know that, but I'm talking about what you can do with slopes and owners of riparian land. I mean, you can't change elevation, you're saying? Well, I don't think you can. If you change the unnatural flow of the water, we have to take the natural flow of the water. So you can't make it go around your house. I'm saying that Mr. Hammack, and that's where the husbandry comes in, if he was making these changes for good husbandry agricultural purposes, that would, I think, change the standard here. But that's not what he's done. There's nothing here that's for this airstrip, a personal airstrip, only to be used by he and his wife under the special use permit. He said there was a stipulation. I couldn't quite hear it, but there was a stipulation that they had not used that runway, personally used that runway, since they last owned a plane, and maybe before that. They last owned a plane in 2008. But Mr. Hammack kind of consistently throughout, he fudges that fact because it was revealed, and the evidence in the case was in 2012. So he sold the plane in 2008. That's how they know they're not using it, at least. In 2012, he files with the IDOC. Some form he has to submit, apparently, and he says on that form, he owns a plane and it's hanged there. Why he does this, I don't know, but it's a false statement. In 2019, he files a similar form with the FAA, and he says, I own a plane, it's on my property. He doesn't. I don't know why he does that. Well, is it still an emergency airstrip? No, it's never been an emergency airstrip. Well, I don't know. But the FAA do? The FAA has done nothing in this regard. They've not been addressed with this. And, by the way, they have regulations, as people know, that if you're having trouble with your runway, if there's anything that's obstructing this RLA, you're to report that if it can't be used. The testimony is he never made one single complaint, one single report to the IDOC or FAA, that anything Mr. Yerrick was doing was causing trouble to the runway. Okay. His position was described by expert Martindale as it simply goes against physics. He has created this problem. It's not natural flow. It's anything but natural flow. The natural flow is a half a mile, 2,600-some feet, sheet flow. Now it's largely 77 out of 80 acres going through that 15-inch culvert and that 18-inch culvert. There can't be anything more unnatural about that. And it's our position, Your Honor, that the courts should affirm what I have read and what you have read is, I think, a rather detailed and well-reasoned opinion by Judge Jumper. I think this notion about whether you can look at the good husbandry of Mr. Yerrick is a red herring. I think there's nothing that says you can't use it as a factor in balancing this. But if you didn't even consider that, if you thought Judge Jumper shouldn't have thought about Mr. Yerrick trying to practice good agricultural husbandry, any balancing you do here of the benefits to Mr. Hamrick's property for having this unused 14-years runway that's only for his limited purpose versus the harm he's doing, the now severe erosion he's doing to Mr. Hamrick's property, which is cultivated farmland. Is he farming the runway now? Yes. And what kind of crops are in there? Well, did you ask about Mr. Yerrick? The runway. What are the crops? Well, on the left side of the runway, Mr. Hamrick's side, he's got corn and beans. I'm talking about the runway itself. The runway itself is just grass. Grass. Okay. Just grass. And Mr. Yerrick is farming, too. But the problem with him putting the beans and corn in, by the way, the rules that are exhibited in the case, you're not supposed to have tall crops. Corn is a tall crop. He's got tall crops. He just didn't care, and we didn't care. He's got beans in there. Beans, to my eye, are not tall. But under the regulations, they are. You're not to have in the buffer land beans. So he's done that. Again, we didn't complain. It's not really affecting us. This is off the point. Well, if you can't have soybeans as a not-tall crop, then what is a not-tall crop? Well, that's a good question. But this is just in a small area. So it's a relatively small area we're talking about. Can I put some wheat in it, I guess? No. Anything else you all would like to ask, please? No, no more questions. Thank you, gentlemen. Rebuttal? Yes, thank you. So you've heard the distraction. This is the distraction. It's all belied by the fact that before this runway was ever put in, there were ditches across the property, ditches across Mr. Orch's property, always there. The runway was put in, and the two people that were witnesses, Mr. Hammack himself and his farm tenant, who was also the farm tenant on Orch's property, actually, testified that there was no changes to the drainage when that occurred. They both testified to that. Now, you heard about this great pressure. There's no great pressure. Nobody observed great pressure. Nobody observed fire hose effects. And the engineer, Mr. Beckman, testified that that's not even possible because these cohorts are right up near the top of the runway. So they want you to think like this is the discharge from the Hoover Dam, you know, down at the bottom where all this water is pushing down. It's shooting water out. That's where that pressure comes from. No. These cohorts are right up, now they're with the top of the runway. If the water backs up, it goes over the runway. It goes over the runway before it ever builds up, the kind of pressure that they're talking about. And I know this. The roads that we're talking about isn't just limited to the 20, 30 foot by these culvert ends. It goes all the way across Mr. Orch's property. That's because that's where the water's flowed forever, until he filled the ditches in and built his boats. There's two references to things I just want to address quick. The crowd, there's testimony that when the runway was built in 1985, there was a crowd. The cross-section references and the observations of everybody are that the crowd does not exist anymore. So perhaps in 1985 the crowd was an issue. Today the crowd is not an issue. It doesn't exist. And those cross-sections show that. And then this slope argument. The slope argument made is, oh, my gosh, this slope is 20 times bigger. Or, oh, my gosh, this slope is 20 or 2.7 times bigger. You're talking about slopes of less than 1%, 1.5%. You know, what is that? What is that? And the expert has the gall to come out and say, I observed that these culverts were way off. Because they're off by 1% on a flat land? It's ridiculous. They're acting like these culverts are like this, and now they're like this. No. This is flat land. And there are decimal points of percentages of the slope of these culverts. And it simply does not change the drainage in any significant way. And that was a testimony of the engineer, Lee Beckman. So we'd ask, again, that the findings of the trial court be reversed, as we've asked, and the case be remanded. Thank you. Thank you, counsel. The case will be taken under advisement, and the order will be issued in due course.